In the Matter of American Surety Company of New York, Petitioner, against Lazarus Joseph, as Comptroller of the City of New York, Respondent.

First Department, April 27, 1954.

*William J. O'Shea* of counsel (*Edward D. Burns* with him on the brief; *Saxe, Bacon, O'Shea & Bryan,* attorneys), for petitioner.

*Bernard H. Sherris* of counsel (*Bernard H. Sherris* and *Stanley Buchsbaum* on the brief; *Adrian P. Burke, Corporation Counsel,* attorney), for respondent.

*Stuart N. Updike* of counsel (*William P. Hindman, Jr., John V. Bloys* and *Cornelius F. Keating* with him on the brief; *Olvany, Eisner & Donnelly,* attorneys), for Life Insurance Association of America, *amicus curiæ.*

BOTEIN, J. This is a proceeding under article 78 of the Civil Practice Act to review a determination of the comptroller of the City of New York imposing on New York Casualty Company a so-called financial tax deficiency for the tax periods commencing July 1, 1946, and ending June 30, 1950.

The enabling act (General City Law, § 24-a) authorizing the city to adopt local laws for the imposition of such taxes, provides for (1) a " general business " or " gross receipts " tax, not exceeding ⅕ of 1%, measured by the gross receipts from any trade, business, profession, vocation or commercial activity, other than a financial business, carried on for gain or profit in the city; and (2) a financial tax, not exceeding ⅖ of 1%, measured by the gross income of any financial business carried on in the city. A financial business is defined as the " services and transactions of private banks, private bankers, dealers and brokers in money, credits, commercial paper, bonds, notes, securities and stocks," etc. (§ 24-a, subsec. 1, par. 2.)

The sole question involved in this proceeding is the right of the comptroller to impose a financial business tax on income of the casualty company which it derives from investments.

The casualty company, which since the levy of the tax has been merged with petitioner American Surety Company of New York, was an insurance company organized under the Insurance Law of this State, and licensed by and subject to the supervision of the Insurance Department. It was authorized to write those kinds of insurance generally classified as casualty and surety. Its principal office was in the city of New York, and almost 90% of its securities were located in that city.

By chapter 199 of the Laws of 1941, the Legislature carefully reframed the enabling act authorizing certain cities to impose a general business and financial tax, and wrote it into

the General City Law in the form of section 24-a. In section 24-a the Legislature set up a complete and comprehensive model law, stating that " [e]very such local law in terms shall be substantially " as set forth in the statutory model.

The city's General Business and Financial Tax Law, so far as pertinent in this proceeding, adopts verbatim the language of the enabling act (Administrative Code of City of New York, ch. 41, tit. RR; ch. 46, tit. B). The provisions of the enabling act under which the particular assessment under review was made were carried into the Local Laws by Local Law 14 of 1946 and Local Law 44 of 1948.

The city's General Business and Financial Tax Law (Administrative Code, § RR41–1.0, subd. 3) contains the following provision applicable to the disputed assessment: " For the purpose of determining receipts from the business of insurance, such receipts shall be taken to mean *receipts from premiums received from risks in the city*, whether by mutual or stock companies, domestic or foreign, without any deductions therefrom for any cost or expense whatsoever * * * *The business of insurance shall not be deemed to be a financial business."* (Emphasis supplied.)

Every year since 1934, the company has filed a General Business Tax return, reporting its receipts " from premiums received from risks in the city " and has paid the taxes due thereon. Until June 1, 1950, the city never called for a report on the company's investment income, nor did it ever claim that a tax should be paid on such income; nor did it ever attempt to assert the higher financial tax on any portion of the company's receipts.

On June 1, 1950, without any amendment of the enabling act, the local law, or his regulations, the comptroller issued a bulletin stating that with respect to receipts of interest and dividends from securities, receipts of interest on bank deposits, and profits realized from the sale of securities, an insurance company " is deemed to be engaged in a financial business and is required to report the same on a financial tax return and pay the tax thereon at the financial tax rate." After the issuance of this bulletin the comptroller caused an audit to be made of the company for the four prior years and on December 1, 1950, he assessed a financial tax deficiency and interest against the company for the period from July 1, 1946, to June 30, 1950, on income derived from interest and dividends on securities, mortgages and deposits and from profits on sales of securities.

The power which the comptroller thus attempted to assert is limited to levying the tax which the Legislature authorized, and to imposing such tax only upon those receipts which the Legislature made subject to tax. " It is not the function of an administrative officer to determine where the line shall be drawn which divides the field subject to taxation from the field where no tax has been imposed " (*Matter of Good Humor Corp.* v. *McGoldrick*, 289 N. Y. 452, 455). Neither by local law nor administrative determination may the city venture beyond the statutory limitations (*Holmes Elec. Protective Co.* v. *City of New York*, 304 N. Y. 202; *Matter of Emigrant Ind. Sav. Bank* v. *McGoldrick*, 268 App. Div. 277, 282).

The basic contention of the city is that income from investments and profits from sales of securities by an insurance company are not receipts from the " business of insurance ", and are separately taxable as receipts resulting from transactions engaged in by the company in the conduct of a financial business. The comptroller, to justify his contention, relies upon subdivision 3 of section 41 of the Insurance Law, which would appear to confine the term " doing an insurance business " to the making of insurance contracts or of contracts of guaranty and surety " as a vocation " — and makes no mention of the investment of insurance funds. Read in context, however, subdivision 3 of section 41 merely sets forth such underwriting and related activities as require prior licensing by the Insurance Department. Significantly, subdivision 3 of section 41 is lodged between section 40, which deals with the issuance and revocation of an insurer's license, and section 42, relating to requirements for a foreign insurer's license.

By laying down " a fairly comprehensive investment code for insurance companies " (*Matter of General Reinsurance Corp.* v. *Pink*, 269 N. Y. 347, 350) the Legislature has recognized that investment of funds is an integral part of the business of insurance. And with good reason, for in the underwriting of many forms of insurance the judicious handling of a company's investment portfolio affects its premium rates and balance sheet just as vitally as does its judicious handling of its claims. The Legislature recognized the importance of the investment function in the operation of an insurance company long before it enacted section 24-a of the General City Law. The following table of contents of article V of the Insurance Law, entitled " Assets, Investments And Deposits ", reflects the legislative concern with the proper handling of insurance company investments:

" § 78. Investments; officers and directors
" § 79. Minimum capital investments
" § 80. Reserve investments required
" § 81. Classes of reserve investments
" § 82. Restrictions on life insurance investments
" § 85. Residue and surplus fund investments
" § 87. Limitation of investments
" § 90. Investments of foreign and alien insurers
" § 91. Valuation of investments
" § 92. Interest, dividends and rents ". (See, also, §§ 26, 28, 32-b, 205 and 312.) The Insurance Department requires insurance companies to set aside reserves for losses or claims, unearned premiums, and against many other contingencies. These reserves usually total huge amounts. At the close of the last tax year under consideration the casualty company's reserves aggregated $11,000,000; and of course it would be unthinkable to permit such sums to remain unproductive of income.

To give subdivision 3 of section 41 the insulated application urged by the city would reduce the doing of an insurance business to the making of underwriting contracts; and exclude such accepted activities as collection of premiums, payment upon the happening of the event insured against, and the complex of functions involved in servicing policies.

We therefore hold that income and profits derived from an insurance company's investments form part of the receipts from the business of insurance; and therefore by legislative definition may not be subjected to a financial tax. But since the Legislature has also specifically confined the base of the permissible general business tax to receipts from premiums, that tax may not be imposed on income or receipts from investment activities or nonpremium sources.

No such restrictive measure is applied to the income on receipts from investment activities of, let us say, a manufacturing business; and accordingly the comptroller taxes such receipts from funds so invested at the business rate (Regulations, arts. 248, 251). This may appear to bring about an inconsistency in the city's tax structure and to wall off from taxation a likely area of income; but such considerations are not persuasive, since the legislative scheme is so clear.

In *Matter of Guardian Life Ins. Co.* v. *Joseph* (272 App. Div. 481, 484, affd. 297 N. Y. 976), the comptroller attempted to tax the considerations received for annuity contracts, arguing that

such considerations were either (a) premiums, and therefore taxable under the express language of the statutes, or (b) receipts from some other type of business transaction, and therefore taxable as general business receipts. Both arguments were rejected. This court held that (a) considerations for the issuance of annuities were not premiums, and (b) that as they were not " receipts from premiums received ", they were not taxable. In the *Guardian* case, as here, income which would be taxable as general business receipts if received by most other types of business was not taxable against an insurance company, since the income did not fall within the specified area of receipts from insurance premiums.

Of course, if a business essentially financial in character were to be conducted either under the guise of an insurance company or a manufacturing company, the substance rather than the form of the business might dictate the propriety of imposing a financial tax on its receipts. But the record on this application indicates that the casualty company was operating an active and extensive insurance business and that the sum of its investments was in no sense disproportionate to the volume of business it transacted and the reserves it was required to maintain.

During the four-year tax period the company's gross income was derived about 97% from premium receipts and about 3% from investment income. Its premium income rose from about $5,000,000 in 1946, to over $13,000,000 in 1949. At all times the company had investments of $7,700,00. During this four-year period the company engaged in 196 security transactions — less than one a week — and of these forty-nine represented receipts of stock dividends, split-ups, exchanges or redemptions, in which the company did not take the initiative. Another twenty-five represented purchases or sales of Government bonds. Only thirty-six sales were made throughout the forty-eight months.

We think the statutes clearly preclude the imposition of either a business or a financial tax on this casualty company's income from investments. If there were any ambiguity, the practical construction placed upon the statute by the city itself would be entitled to great weight. At no time since the authorization of the tax, and up to 1950, did the city claim that the tax to be paid by any insurance company should include a tax on investment income. When the tax was first authorized in 1934, in response to an inquiry, the city collector wrote that the " receipts contemplate only the gross amount of direct premiums received in New York City."

The tax imposed by the comptroller is invalid in its entirety, and the comptroller's determination should be annulled and the city directed to return the sum deposited by petitioner with the city treasurer.

CALLAHAN, J. P., BREITEL and BASTOW, JJ., concur.

Determination unanimously annulled, with $50 costs and disbursements to the petitioner, and the city is directed to return the sum deposited by petitioner with the city treasurer.